<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JOHN DOUGLAS JACKSON, : | |
| : | |
| Plaintiff, : | Civil No. 09-5617 (NLH) |
| : | |
| v. : | |
| : | |
| J. GRONDOLSKY, et al. : | **MEMORANDUM OPINION** |
| : | **AND ORDER** |
| Defendants. : | |
| : | |

**HILLMAN**, District Judge:

This matter comes before the Court upon Plaintiff's filing of an amended complaint and his filing of <u>in forma pauperis</u> application in a related matter.  After reviewing these submissions, the Court will grant Plaintiff <u>in forma pauperis</u> for the purposes of the instant action.  For the reasons detailed below, two narrowly-tailored lines of Plaintiff's claims will be allowed to proceed past the <u>sua sponte</u> dismissal stage.  The remaining claims will be dismissed with prejudice.

Since Plaintiff has an extensive litigation history in this Court, it is helpful to summarize the issues raised, addressed, resolved and still pending in Plaintiff's various actions.

I.    **PROCEDURAL HISTORY**

On March 12, 2009, the Clerk received Plaintiff's first civil complaint which was filed as Docket Entry No. 1 in Jackson v. Grondolsky, Civil Action No. 09-1112 (D.N.J.) ("Jackson I"). Although that submission arrived without a filing fee or an in forma pauperis ("IFP") application, this Court granted Plaintiff conditional IFP status in light of his allegations that he was swiftly going blind due to an alleged denial of medical care. See Jackson I, Docket Entry No. 2.  Although the Court directed service of the complaint in Jackson I, Plaintiff did not submit his IFP but, instead, submitted his amended complaint in Jackson I, which superseded Plaintiff's original complaint and stated no viable causes of action.  See Jackson I, Docket Entries Nos. 4 to 7.  Therefore, this Court dismissed Plaintiff's amended complaint, without prejudice to his filing a second amended pleading and, in addition, extended his time to submit an IFP. See Jackson I, Docket Entry No. 7.

In response, Plaintiff again failed to submit his IFP application, nor did he submit his second amended pleading. Rather, he submitted a motion seeking a stay.  See Jackson I, Docket Entry No. 8.  The Court consequently denied Plaintiff's motion seeking a stay and again extended his time to submit a second amended pleading and IFP application.  See Jackson I, Docket Entry No. 9.  In response, Plaintiff submitted his second

amended pleading and a letter requesting that the second amended
pleading be filed as a new and separate civil matter. See Jackson
I, Docket Entries Nos. 11 and 13.  The Court, therefore, issued
an order advising Plaintiff of the statute of limitations
consequences that might ensue from filing Plaintiff's second
amended pleading as an original pleading in a new matter;
explaining to Plaintiff that the collection of filing fees
arising from the grant of conditional IFP status in Jackson I
would continue; and further explaining that Plaintiff would be
responsible for another filing fee (or for submission of another
IFP application and resulting collection of the filing fee) in
the new matter.  See Jackson I, Docket Entry No. 14.  In
response, Plaintiff reaffirmed his desire to have his second
amended pleading docketed as an original complaint in a new and
separate matter.  See Jackson I, Docket Entry No. 16.

By that time, the Clerk received another complaint from
Plaintiff, which was identical in all substantive respects to
Plaintiff's second amended pleading submitted in Jackson I.  On
the basis of that other complaint, the Clerk initiated another
civil matter for Plaintiff, Jackson v. Grondolsky, Civil Action
No. 09-5617 (D.N.J.). ("Jackson II").  See Jackson II, Docket
Entry No. 1.  The Jackson II matter was originally assigned to
Judge Jerome B. Simandle, but was reassigned, shortly thereafter,
to the undersigned by Chief Judge Garrett E. Brown, Jr.  See

Jackson II, Docket Entry No. 2.  Since Plaintiff's second amended
pleading in Jackson I was substantively identical to Plaintiff's
complaint already received and docketed in Jackson II, the Court
deemed Jackson II the new and separate matter in which Plaintiff
wished to file his second amended pleading submitted in Jackson
I.

    However, since Plaintiff did not submit his filing fee or
his IFP in Jackson II, and since the complaint in Jackson II did
not allege facts sufficient to waive those requirements as his
earlier pleading had, the Court denied Plaintiff IFP status as to
Jackson II.  Such denial was without prejudice to Plaintiff
submitting his IFP application or the filing fee with respect to
Jackson II within thirty days from the date of entry of the
Court's order.  See Jackson II, Docket Entry No. 3.

    In the interim, the Clerk received another civil complaint
from Plaintiff and opened another civil matter for him, Jackson
v. Grondolsky, Civil Action No. 09-6459, Docket Entry No. 1
(D.N.J.) ("Jackson III").  The complaint received in Jackson III
was substantively identical to the complaint received in Jackson
II (and to the second amended pleading received in Jackson I).
See id. As with Plaintiff's submissions in Jackson I and Jackson
II, the complaint in Jackson III arrived without Plaintiff's
filing fee or his IFP application.  See id.  In light of
Plaintiff's complaint in Jackson III being substantively

4

identical in all respects to Plaintiff's complaint submitted in
Jackson II, this Court directed the Clerk to terminate the
Jackson III matter as duplicative of Jackson II.  See Jackson
III, Docket Entry No. 3.

In response, Plaintiff submitted a letter seeking reopening
of Jackson III and asserting that Plaintiff is being unduly
confused for another litigant who was the plaintiff in Jackson II
and a person different from Plaintiff.  See id., Docket Entry No.
4.  In addition, Plaintiff submitted an application seeking
injunctive relief.  See id., Docket Entry No. 5.  Again, none of
the pleadings in Jackson I, Jackson II and Jackson III, a series
of cases initiated on March 12, 2009 - more than a year and a
half ago - have been submitted along with a proper filing fee or
a complete IFP application.

On April 14, 2010, this Court issued an order in Jackson III
denying Plaintiff's request to reopen that matter and also
denying him injunctive relief.  See id., Docket Entry No.6
Specifically, the Court rejected the claim that cases were
brought by separate individuals as the litigant in Jackson I
identified himself to the Clerk as "John Jackson, ID # 33190-037,
confined at the F.C.I. Fort Dix," see Jackson I, Docket, and the
litigant in Jackson II and Jackson III identified himself as
"JOHN DOUGLAS JACKSON, ID # 33190-037, confined at the F.C.I.
Fort Dix."  See Jackson II and Jackson III, Dockets.  Therefore,

Plaintiff's request to reopen Jackson III on the grounds that
Plaintiff was a litigant other than the plaintiff in Jackson II
was deemed without merit and denied.  See Jackson III, Docket
Entry No. 6.

In addition, the Court expressed its concern over
Plaintiff's year-long persistent refusal to submit IFP
applications in Jackson I, Jackson II and Jackson III or to
prepay his filing fee in either one of this matters, as well as
with Plaintiff's attempts to proliferate -- without any reason --
the number of his civil actions initiated in this District.  The
Court, therefore, directed Plaintiff to submit a complete IFP
application or his filing fee and refrain from initiation of
duplicative actions.  See id.  Giving Plaintiff one last chance,
this Court extended Plaintiff's time to submit his IFP
application or to prepay his filing fee in Jackson II.  See id.
Plaintiff's IFP application was then duly filed, although it was
docketed in the Jackson III matter.  The Court, however, will
construe this submission as made for the purposes of the Jackson
II matter and will grant Plaintiff IFP status for the purposes of
the instant Jackson II proceedings, and will direct corresponding
installment collections from Plaintiff's prison account.  The
Jackson I action (with IFP collections accruing) and the Jackson
III action (with no IFP collections accruing) will both remain
terminated.

6

Having conducted a procedural overview, this Court now turns to the substantive history of Plaintiff's actions.

## II.   SUBSTANTIVE HISTORY

### A.   Challenges Raised and Dismissed in *Jackson I*

As noted supra, Plaintiff's initiated a series of actions in this District starting with a civil complaint in Jackson I. Since Plaintiff's challenges raised in Jackson I were examined substantively by this Court when he submitted his amended complaint in Jackson I, it appears warranted to replicate the Court's analysis in the instant Memorandum Opinion for the purposes of comparing Plaintiff's claims raised in the amended complaint filed in Jackson II, the set of pleadings currently before this Court.

Specifically, in Jackson I, the Court observed as follows:

Plaintiff's Amended Complaint names, as Defendants in this action, the following persons: (a) Warden Grondolsky ("Grondolsky"); (b) Doctor Seabur ("Seabur"); (c) Mr. Spalding ("Spalding"); (d) Ms. Lopez; (e) Ms. Cane; (f) Mr. Sutterland ("Sutterland"); and (g) a certain Jane Doe ("Doe") who, apparently, signed certain documents with inscription reading "mmm."

Plaintiff's allegations could be summarized as follows: at the time of his transfer from FCI Big Spring to the place of his current confinement, FCI Fort Dix, Plaintiff arrived to Fort Dix with already established diagnoses of uveitis, glaucoma, photophobia, cataract, and sarcoidosis. In light of Plaintiff's diagnoses, Plaintiff had surgery while at FCI Big Spring, and ongoing treatment in the form of three types of eye drops and medical monitoring of Plaintiff's eye condition. Upon his arrival at For Dix, Plaintiff informed the prison officials of his diagnoses and requested refills of the three prescribed eye drops.

7

Plaintiff's request was approved and, thirty [days]
after his arrival to Fort Dix, he was examined by Defendant
Seabur.  However, Plaintiff alleges that, after an initial
prompt refill of his prescription, Plaintiff's requests for
following refills were delayed on numerous occasions for
non-medical reasons.  In addition, Plaintiff asserts that,
when his eye condition began deteriorating and resulted in
burning, itching and pain in the eyes, Defendants denied
Plaintiff's request to be examined by an ophthalmologist,
and his condition continued to be monitored by Defendant
Seabur, who is an optometrist who, seemingly, either
conducted eye pressure checks less frequently than what
Plaintiff desired or never conducted these checks.
Plaintiff asserts that, as a result of insufficient medical
treatment, he lost vision in his left eye.

Plaintiff's allegations against Defendants other than
Seabur read as follows:

The facts of this case are very simplistic.
Clearly, all the Defendants named in this
Complaint played a part in the denial of
Plaintiff's reasonable request for adequate
medical care, and treatment, that resulted in a
devastating loss of vision to Plaintiff's left
eye, with possible irreparable harm and serious
danger to his right eye, whatsmore [sic].
Defendants all played a part in intentionally
imparing [sic] and impeding Plaintiff's efforts
in receiving the adequate eye care via an
ophthalmologist which exposed Plaintiff to undue
suffering and threat to tangible injury when all
Defendants had full intellectual knowledge of
Plaintiff's chronic eye disease, blindness to his
left eye, and Plaintiff's urgent need for the
proper medical care, via a treatment plan. . . .
Ms. Lopez, Mr. Spalding, Ms. Cane intentionally
refused to refer Plaintiff to an ophthalmologist
who was qualified to provide Plaintiff with the
care that he needed.  . . .  Plaintiff made a
written request known to Ms. Lopez . . .
explaining to her in full detail about his
chronic eye disease, and what Dr. Seabur . . .
advised him to bring his urgent request to see an
ophthalmologist to her attention.  Ms. Lopez . .
. never responded.  Plaintiff seen Ms. Cane at
the lunch main-line and explained his situation
to her that he could not see out of his left eye,

that he needed to see a specialist, because Dr. Seabur said there was nothing he could do.  Ms. Cane specifically advised plaintiff that Dr. Seabur was only an optometrist, and not an ophthalmologist. . . . Plaintiff then spoke with Mr. Spalding about his complications from sarcoidosis and his loss of vision, in his left eye.  Mr. Spaldings response to Plaintiff was very unprofessional and opprobrious, Spalding replied to plaintiff in a very acrimonious tone of voice asking Plaintiff "Who do you think you are? You don't get to see the Doctor you want to see, and you don't impress me with your big words. Plaintiff was absolutely mortified. Plaintiff's medical treatment plan was denied for non-medical reasons.  The Jane Doe administrator remedy coordinator . . . and Mr. Suterland erected arbitrary and burdensome procedures that resulted in interminable delays and outright denials of adequate medical care to Plaintiff.

Personal involvement by a defendant is an indispensable element of a valid legal claim; such personal involvement may exist only where the named defendant violated the plaintiff's rights either by executing the acts at issue himself or herself, or by directing others to violate the plaintiff's rights.  See Baker v. Monroe Township, 50 F.3d 1186, 1190-91 (3d Cir. 1995); Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).  Conversely, where no personal involvement by the defendant is asserted, the plaintiff's claim against that defendant is subject to dismissal.  Rode, 845 F.2d at 1207.  Thus, it is well established that supervisory liability cannot be imposed under § 1983 on a respondeat superior theory.  See Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978); Rizzo v. Goode, 423 U.S. 362 (1976).  "'A defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of respondeat superior.'"  Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005) (quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988)).  Personal involvement can be shown through allegations that a defendant directed a deprivation of a plaintiff's constitutional rights, see id.; Monell, 436 U.S. at 694-95 (1978), or if the supervisor implemented deficient policies and was deliberately indifferent to the resulting risk or the supervisor's actions and inactions were "the moving force" behind the harm suffered by the plaintiff.  See Sample v. Diecks, 885

F.2d 1099, 1117-118 (3d Cir. 1989); <u>see</u> <u>also</u> <u>City of Canton</u>
<u>v. Harris</u>, 489 U.S. 378 (1989); <u>Heggenmiller v. Edna Mahan</u>
<u>Corr. Inst. for Women</u>, No. 04-1786, 128 Fed. App'x 240 (3d
Cir. 2005).

     Plaintiff has a protected right in being incarcerated
at a place of confinement conforming to the standards set
forth by the Eighth Amendment.  The Constitution "does not
mandate comfortable prisons," <u>Rhodes v. Chapman</u>, 452 U.S.
337, 349 (1981), but neither does it permit inhumane ones,
and it is now settled that "the treatment a prisoner
receives in prison and the conditions under which he is
confined are subject to scrutiny under the Eighth
Amendment." <u>Helling v. McKinney</u>, 509 U.S. 25, 31 (1993).
In its prohibition of "cruel and unusual punishments, the
Eighth Amendment . . . imposes duties on prison officials,
who must provide humane conditions of confinement; prison
officials . . . must take reasonable measures to guarantee
the safety of the inmates." <u>Hudson v. Palmer</u>, 468 U.S. 517,
526-527 (1984), <u>see</u> <u>Helling</u>, 509 U.S. at 31-32; <u>Washington</u>
<u>v. Harper</u>, 494 U.S. 210, 225 (1990); <u>Estelle v. Gamble</u>, 429
U.S. 97, 103 (1976).  The Eighth Amendment prohibits
conditions which involve the unnecessary and wanton
infliction of pain or are grossly disproportionate to the
severity of the crime warranting imprisonment. <u>Rhodes</u>, 452
U.S. at 346, 347.  The cruel and unusual punishment standard
is not static, but is measured by "the evolving standards of
decency that mark the progress of a maturing society."
<u>Rhodes</u>, 452 U.S. at 346 (quoting <u>Trop v. Dulles</u>, 356 U.S.
86, 101 (1958)).  Thus, to prevail on a medical care claim
under the Eighth Amendment, an inmate must show that the
defendants were deliberately indifferent to his serious
medical needs.  <u>See</u> <u>Estelle v. Gamble</u>, 429 U.S. 97; <u>Rouse v.</u>
<u>Plantier</u>, 182 F.3d 192, 197 (3d Cir. 1999).  Persistent
severe pain qualifies as a serious medical need.  A medical
need is serious where it "has been diagnosed by a physician
as requiring treatment or is . . . so obvious that a lay
person would easily recognize the necessity for a doctor's
attention." <u>Monmouth County Correctional Institution</u>
<u>Inmates v. Lanzaro</u>, 834 F.2d 326, 347 (3d Cir. 1987), <u>cert.</u>
<u>denied</u>, 486 U.S. 1006 (1988). "Deliberate indifference" also
exists "where a prison official: (1) knows of a prisoner's
need for medical treatment but intentionally refuses to
provide it; (2) delays necessary medical treatment based on
a non-medical reason; or (3) prevents a prisoner from
receiving needed or recommended medical treatment." <u>Rouse</u>,
182 F.3d at 197.  Furthermore, deliberately delaying
necessary medical diagnosis for a long period of time in

order to avoid providing care may constitute deliberate indifference that is actionable.  See Durmer v. O'Carroll, 991 F.2d 64 (3d Cir. 1993).  Deliberate indifference is also found where officials erect arbitrary and burdensome procedures that result in interminable delays and denials of medical care to suffering inmates.  See Monmouth County Correctional Institution Inmates v. Lanzaro, 834 F.2d 326, 346-47 (3d Cir. 1987), cert. denied 486 U.S. 1006 (1998).  However, neither inconsistencies or differences in medical diagnoses, nor refusal to consider inmate's self-diagnoses, to summon the medical specialist of the inmate's choice, to perform tests or procedures that the inmate desires, to explain to the inmate the reason for medical action or inaction, or to take measures to ensure against a hypothetical future medical problem cannot amount to cruel and unusual punishment.  See White v. Napoleon, 897 F.2d 103 (3d Cir. 1990) (mere disagreements over medical judgment do not state Eighth Amendment claims); Jones v. Lockhart, 484 F.2d 1192 (8th Cir. 1973) (allegations of mere differences of opinion over matters of medical judgment fail to state a federal constitutional question); Hyde v. McGinnis, 429 F.2d 864 (2d Cir. 1970) (a difference of opinion between physician and patient did not sustain a claim under § 1983; the conduct must be so harmful that it should be characterized as a barbarous act that shocked the conscience); Patterson v. Lilley, 2003 U.S. Dist. LEXIS 11097 (S.D.N.Y. June 20, 2003) (defendants could only be held deliberately indifferent to an existing serious medical condition, not a speculative future medical injury); Goff v. Bechtold, 632 F. Supp. 697 (S.D. W. Va. 1986) (denial of preferred course of treatment does not infringe constitutional rights); accord McClung v. Camp County, 627 F. Supp. 528 (E.D. Tex. 1986) (evidence that diabetic inmate was given medication 3 times per day instead of prescribed 4 daily doses was insufficient to constitute constitutional violation in absence of demonstrated harm); Jefferson v. Douglas, 493 F. Supp. 13 (W.D. Okla. 1979) (inmate's difference of opinion with prison medical staff as to proper diet he was to receive for his diabetes did not constitute cruel and unusual punishment to sustain claim under 42 U.S.C. § 1983); Smith v. Sator, 102 Fed. App'x 907 (6th Cir. 2004) (where a prisoner alleged that defendants did not provide various specialized medical tests that the prisoner found to be necessary based on his reading of medical literature, the court held that the complaint was frivolous because refusal to provide specialized tests amounted to nothing more than a difference of opinion regarding the medical diagnosis and treatment and did not rise to the

11

level of an Eighth Amendment violation); <u>Lopez v. Kruegar</u>,
1990 U.S. Dist. LEXIS 6808 (E.D. Pa. June 4, 1990) (where
plaintiff stated that he was receiving medication but felt
that additional medical tests should be taken, his
allegations were directed at the wisdom or quality of
treatment and did not state a claim); <u>Coleman v. Crisp</u>, 444
F. Supp. 31 (W.D. Okla. 1977) (difference of opinion between
plaintiff and doctors concerning availability of treatment
and medication did not establish violation of constitutional
right or sustain claim); <u>McNeil v. Redman</u>, 21 F. Supp. 2d
884 (C.D. Ill. 1998) (an inmate has no constitutional right
to see a doctor on demand; the decision whether to summon a
doctor, like the question of whether a certain diagnostic
technique or form of treatment should be prescribed, "is a
classic example of a matter for medical judgment") (quoting
<u>Estelle</u>, 429 U.S. 97).  Moreover, the allegations that the
inmate was provided with medical care, but the care was
"inadequate," fail to state a cognizable claim.  <u>See</u>
<u>Gatewood v. Hendrick</u>, 368 F.2d 179 (3d Cir. 1966), <u>cert.
denied</u>, 386 U.S. 925 (1967) (prisoner who did not claim that
he was denied any medical care but rather that he received
only inadequate medical care, and gave no indication that he
sustained serious physical injury as result of alleged
inadequate treatment, failed to state claim for relief); <u>see
also</u> <u>Alsina-Ortiz v. Laboy</u>, 400 F.3d 77 (1st Cir. 2005)(a
doctor's failure to respond to certain request for services
by the inmate, in context of the doctor's continued and
regular services, did not deprive the inmate of any
meaningful treatment); <u>Hasty v. Johnson</u>, 103 Fed. App'x 816
(5th Cir. 2004) (prisoner failed to state a claim for
deliberate indifference to his medical needs where he
alleged that medical personnel provided him with purportedly
less efficacious drugs for gastroesophageal reflux disease;
the decisive fact was that he received "a" treatment);
<u>Church v. Hegstrom</u>, 416 F.2d 449 (2d Cir. 1969) (mere
negligence does not suffice to support a § 1983 action);
<u>Watson v. Weldon</u>, 2000 U.S. Dist. LEXIS 11109 (D.S.C. Jan.
12, 2000) (prisoner's claim that prison doctor's slow
treatment of plaintiff's toenail fungus was cruel and
unusual punishment failed to state a serious medical
condition sufficient to support a claim for relief).

     Furthermore, acts of verbal harassment cannot qualify
as violations of the Eighth Amendment.  <u>See</u> <u>Stepney v.
Gilliard</u>, 2005 U.S. Dist. LEXIS 31889, at *19 (N.J.D. Dec.
8, 2005) ("Verbal harassment and taunting is neither
'sufficiently serious' nor 'an unnecessary and wanton
infliction of pain' under the common meaning of those terms.

'Verbal harassment or profanity alone . . . no matter how inappropriate, unprofessional, or reprehensible it might seem,' does not constitute the violation of any federally protected right and therefore is not actionable under Section 1983") (quoting <u>Shabazz v. Pico</u>, 994 F. Supp. 460, 474 (S.D.N.Y. 1998), and citing <u>Collins v. Graham</u>, 377 F. Supp. 2d 241, 244 (D. Me. 2005)); <u>see also</u> <u>Robinson v. Taylor</u>, 2005 U.S. Dist. LEXIS 20951, at *8-9 (D. Del. Sept. 26, 2005) ("Mere verbal harassment does not give rise to a constitutional violation; even if it is inexcusable and offensive, it does not establish liability under section 1983) (quoting <u>McBride v. Deer</u>, 240 F.3d 1287, 1291 n.3 (10th Cir. 2001) and citing <u>Moore v. Morris</u>, 116 Fed. App'x 203, 205 (10th Cir. 2004), <u>Freeman v. Arpaio</u>, 125 F.3d 732, 738 (9th Cir. 1997), and <u>Prisoners' Legal Ass'n v. Roberson</u>, <u>822 F. Supp. 185</u>, 187-89 (D.N.J. 1993)); <u>Abuhouran v. Acker</u>, 2005 U.S. Dist. LEXIS 12864, at *15 (E.D. Pa. June 29, 2005) ("It is well established . . . that . . . verbal harassment, . . . standing alone, does not state a constitutional claim") (citing <u>Dewalt v. Carter</u>, 224 F.3d 607, 612 (7th Cir. 1999); <u>Williams v. Bramer</u>, 180 F.3d 699, 706 (5th Cir. 1999); <u>Maclean v. Secor</u>, 876 F. Supp. 695, 698 (E.D. Pa. 1995)); <u>Collins v. Cundy</u>, 603 F.2d 825 (10th Cir. 1979) (dismissing prisoner's claim that defendant laughed at prisoner and threatened to hang him).

Finally, the Fourteenth Amendment does not guarantee inmates a right to an investigation or a response from prison officials as to administrative grievances (or to any replies by prison officials to inmates' other complaints or demands of a grievance nature). <u>See</u>, <u>e.g.</u>, <u>Wilson v. Horn</u>, 971 F. Supp. 943, 947 (E.D. Pa. 1997), <u>aff'd</u>, 142 F.3d 430 (3d Cir. 1998); <u>McGuire v. Forr</u>, 1996 U.S. Dist. LEXIS 3418 at *2, n.1 (E.D. Pa. Mar. 21, 1996), <u>aff'd</u>, 101 F.3d 691 (3d Cir. 1996); <u>see also</u> <u>Adams v. Rice</u>, 40 F.3d 72, 75 (4th Cir. 1994), <u>cert. denied</u>, 514 U.S. 1022 (1995); <u>Flick v. Alba</u>, 932 F.2d 728, 729 (8th Cir. 1991); <u>Mann v. Adams</u>, 855 F.2d 639, 640 (9th Cir. 1988); <u>Brown v. G. P. Dodson</u>, 863 F. Supp. 284, 285 (W.D. Va. 1994). Furthermore, if construed as a First Amendment allegation -- rather than a Fourteenth Amendment one -- an assertion that an official failed to respond to an inmate's grievance fails to state a cognizable claim. <u>See</u> <u>Minnesota State Bd. for Community Colleges v. Knight</u>, 465 U.S. 271, 285 (1984). "Nothing in the First Amendment or in . . . case law interpreting it suggests that the rights to speak, associate, and petition require government policymakers to listen or respond to individuals communications." <u>Id.</u>; <u>see also</u> <u>Foraker v. Chaffinch</u>, 501

F.3d 231, 237 (3d Cir. 2007) (pointing out that the courts "have never held . . . that a report of a . . . misconduct . . . constitutes 'petitioning activity'" and citing <u>Hill v. Borough of Kutztown</u>, 455 F.3d 225, 230-32 (3d Cir. 2006)); <u>Bieregu v. Reno</u>, 59 F.3d 1445, 1453 n.3 (3d Cir. 1995) (noting that, "at the founding, the Petition Clause also implied a congressional duty to respond . . . . In the Civil War era, however, Congress enacted rules abolishing the duty to respond, a change later sanctioned by the Supreme Court," and citing, <u>inter alia</u>, <u>Smith v. Arkansas State Highway Employees</u>, 441 U.S. 463, 465 (1979) (<u>per curiam</u>) (constitution does not require government "to listen or to respond" to citizen petition), and <u>Minnesota State Bd.</u>).

In light of the aforesaid standards, Plaintiff's Amended Complaint fails to state a claim against the bulk of the named Defendants.

(a)   Plaintiff's allegations against Defendant Cane are limited to an assertion that Cane informed Plaintiff of Seabur's medical specialization and Plaintiff's self-serving conclusion that Cane "clearly . . . played a part" in the alleged wrong, and "intentionally refused to refer Plaintiff to an ophthalmologist," even though Plaintiff neither alleges any facts supporting these conclusions nor even asserts that Cane had any power to refer Plaintiff for treatment.  Since Plaintiff's claims against Cane do not assert any facts indicating Cane's personal involvement in any violations of Plaintiff's rights, his claims against Cane should be dismissed.

(b)   Plaintiff's allegations against Doe and Sutterland fare no better.  According to the Amended Complaint, both Doe and Sutterland were officials in charge of administrative processing of grievances.  Without providing the Court with a single fact, Plaintiff limits his allegations against these Defendants with a self-serving conclusion that they "erected arbitrary and burdensome procedures that resulted in interminable delays and outright" violated Plaintiff's rights. While it is true that deliberate indifference could be found where officials "erect arbitrary and burdensome procedures that result in interminable delays and denials of medical care," <u>Lanzaro</u>, 834 F.2d at 346-47, "Rule 8 requires Plaintiff to assert more than labels and conclusions, and a formulaic recitation of the elements of a cause of action . . . ." <u>Twombly</u>, 127 S.

Ct. at 1964-65.  Therefore, without Plaintiff's detailed explanation as to which "arbitrary and burdensome procedures" were erected by these Defendants, Plaintiff's allegations against them are as insufficient as his self-serving conclusion that they "clearly . . . played a part" in violation of Plaintiff's rights, and should be dismissed.

(c)   Similarly, as stated, Plaintiff's allegations against Defendants Grondolsky and Spalding fail to amount to a cognizable claim.  Even if the Court assumes the truth of the assertion that Spalding used a rude tone with the Plaintiff, such conduct does state an Eighth Amendment claim.  Plaintiff's allegations against these Defendants amounting to a self-serving conclusion that these Defendants "clearly . . . played a part" in violation of Plaintiff's rights cannot state a claim. At most, Plaintiff's claims against these Defendants appear to be based on the doctrine of respondeat superior, which is insufficient to state a claim. Finally, even if this Court were to read Plaintiff's allegations as a claim based on failure to respond to Plaintiff's grievances, Plaintiff's allegation still do not amount to a cognizable claim, since a failure to respond to an inmate's grievances "does not violate his rights to due process and is not actionable," Stringer v. Bureau of Prisons, 145 Fed. App'x 751, 753 (3d Cir. 2005) (citing Antonelli v. Sheahan, 81 F.3d 1422, 1430 (7th Cir. 1996)), and Plaintiff's assertions do not qualify for the narrow exception ensuing from Nami v. Fauver, 82 F.3d 63 (3d Cir. 1996).  In Nami, pro se plaintiff inmates brought an action under 42 U.S.C. § 1983 against defendants Commissioner of the New Jersey Department of Corrections, the warden, and the Assistant Superintendent of the Unit, in which plaintiffs alleged that conditions in which they were confined amounted to cruel and unusual punishment under the Eighth Amendment.  When the complaint was dismissed on the basis of the theory of respondeat superior, (and that the defendants were state officials immune from suit under the Eleventh Amendment), the Court of Appeals reversed, stating:

> We must determine whether, under any reasonable reading of the pleadings, the plaintiffs may be entitled to relief . . . .
> The complaint will be deemed to have alleged sufficient facts if it adequately put the

defendants on notice of the essential
elements of the plaintiffs' cause of action.
. . . The district court's order granting
the defendants' motion to dismiss will be
affirmed only if it appears that the
plaintiffs could prove no set of facts that
would entitle them to relief. See Conley v.
Gibson, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed.
2d 80 (1957). . . . The complaint actually
states that "letters have been written to
the administration concerning all matters
set forth in the complaint. All requests for
administrative remedies were refused." . . .
This suggests that the defendants here were
on actual notice by plaintiffs' reports of
plaintiffs' conditions of confinement.
Although, by itself, such notice may not
equal proof of deliberate indifference, it
nevertheless directly contradicts the
district court's tacit  conclusion . . .
that plaintiffs could prove no set of facts
that would . . . entitle them to relief. . .
. We cannot say that the plaintiffs would be
unable to prove that prison conditions were
objectively unacceptable, and that prison
officials were deliberately indifferent to
plaintiffs' plight. Moreover, the district
court entertained, but rejected . . . the
possibility that plaintiffs may be able to
satisfy some deficiencies in their original
pleading by filing an amended complaint even
though plaintiffs may be able to allege in
an amended complaint, for example,
sufficient facts to support a finding that
some defendants displayed deliberate
indifference to certain harms, or that all
officials were deliberately indifferent to
the possibility that the conditions under
which they housed the plaintiffs
significantly increased the possibility of
such well-known harms . . . .

Nami v. Fauver, 82 F.3d at 65-68.  Reading the holding
of Nami rendered in 1996 through the prism of the
Twombly Court's abandonment of the Conley language, and
the Court of Appeals' guidance in Durmer v. O'Carroll,
991 F.2d 64 (3d Cir. 1993), and Spruill v. Gillis, 372
F.3d 218 (3d Cir. 2004), the Court concludes that

Plaintiff's allegations against Defendants Grondolsky
and Spalding are subject to dismissal.[1]  Here,
Plaintiff's Exhibit "B" indicates that Plaintiff's
grievances were limited to: (a) his dissatisfaction
with the way the grievance process was administered at
Fort Dix; and (b) assertions of Plaintiff's
disagreement with Defendant Seabur's medical
conclusions.  Similarly, Plaintiff's allegations
against Spalding are limited to the assertion that
Spalding ignored Plaintiff's interest in being treated
by a medical professional other than Defendant Seabur.
Since these allegations do not indicate that Plaintiff
ever asserted to either Grondolsky or Spalding that he

---

[1]  In Durmer, the Court of Appeals approved the grant of
summary judgment in favor of the Commissioner of Corrections and
prison warden accused of deliberate indifference to the
plaintiff's serious medical needs.  In that case, "the only
allegation against either of these two defendants was that they
failed to respond to letters the inmate-plaintiff sent to them
explaining his predicament."  Durmer, 991 F.2d  69.  The court
concluded that "neither of these defendants . . . is a physician,
and neither can be considered deliberately indifferent simply
because they failed to respond directly to the medical
complaints of a prisoner who was already being treated by the
prison doctor."  Id. at 69.  Further elaborating on the same
issue in Spruill, the Court of Appeals observed as follows:
"If a prisoner is under the care of medical experts (two medical
doctors in this case), a non-medical prison official will
generally be justified in believing that the prisoner is in
capable hands.  This follows naturally from the division of labor
within a prison.  Inmate health and safety is promoted by
dividing responsibility for various aspects of inmate life among
guards, administrators, physicians, and so on.  Holding a
non-medical prison official liable in a case where a prisoner was
under a physician's care would strain this division of labor.
Moreover, under such a regime, non-medical officials could even
have a perverse incentive not to delegate treatment
responsibility to the very physicians most likely to be able to
help prisoners, for fear of vicarious liability."  Spruill, 372
F.3d at 236.  Joint reading of Twombly, Phillips, Nami, Dumer and
Spruill leads this Court to conclude that a mere allegation by a
prisoner that he filed grievances with -- or orally informed --
prison officials about deficiencies of his ongoing medical care
must be dismissed for failure to state a cognizable
constitutional claim.

was not under a medical care of a medical professional, these claims should be dismissed.

(d) That leaves the Court with Plaintiff's allegations against Defendants Seabur and Lopez only.  As drafted, these allegations too appear questionable: indeed, in his Amended Complaint Plaintiff admits that he was provided with some medical care, and his allegations are merely limited to his opinion that the care was either inadequate or did not provide him with assurances against the speculative injuries Plaintiff may eventually suffer in the future.  However, the Court cannot rule out the possibility that Plaintiff's choice of words was merely reflective of his lack of legal savvy rather than lack of sufficient facts and, if allowed to elaborate on his allegations, Plaintiff might be able to state sufficient claims against these Defendants.[2]

Jackson I, Docket Entry No. 7 (citations to docket entries and original brackets omitted, all footnotes – except for original footnotes 7 and 8 - removed).

**B.   Amended Complaint Filed in the Instant Matter**

    **1.   Challenges Raised in the Amended Complaint**

---

[2] As the discussion of applicable legal standards provided supra illustrates, Plaintiff's assertion that Seabur did not administer the pressure checks Plaintiff desired cannot amount to a cognizable claim, since Plaintiff has no constitutional right to tests of his choice.  However, Plaintiff's allegations might be sufficient to survive sua sponte dismissal as to Seabur's decision to deny Plaintiff the medications prescribed to Plaintiff at FCI Big Spring.  Moreover, Plaintiff seems to assert that Seabur came to a good-faith medical judgment that Plaintiff's health condition required Plaintiff's reference to a medical professional having expertise other than that of Seabur, and Plaintiff informed Lopez accordingly, but neither Seabur nor Lopez acted upon Seabur's medical judgment.

In light of the aforesaid discussion, this Court now examines Plaintiff's claims raised in the amended complaint filed in this matter, that is, in <u>Jackson II</u>.

Specifically, Plaintiff's amended complaint, pared down to allegations of the relevant facts, alleges as follows:

1.  Plaintiff . . . is a federal prisoner [then housed] at . . . Fort Dix . . . .
2.  Defendant . . . Grondolsky [is] the Warden of . . . Fort Dix . . . .
3.  Defendant Sutterland[] is the assistant warden [of] Fort Dix . . . .
4.  Defendant Dr. Seabur[] is the [o]ptometrist [at Fort Dix].
5.  Defendant . . . Lopez . . . is the Medical Director at . . . Fort Dix . . . .
6.  Defendant . . . Cane[] is the Assistant Health Services [supervisor] at . . . Fort Dix . . . .
7.  Defendant Spoulding[] . . . is the Health Administrator at . . . Fort Dix . . . .
8.  Defendant United States of America, the Bureau of Prisons is a component of the Department of Justice . . . . .

. . . .

10. On April 14, 2008 the plaintiff arrived at . . . Fort Dix[] from [the correctional facility at] Big Spring Texas . . . . While at . . . Big Spring[,] the plaintiff suffered from loss of vision and . . . was seen by [an o]ptometrist [who] referr[ed him] to an eye specialist [who, in turn, informed the plaintiff that] he suffered from a disease "[u]veitis, [g]la[u]coma, [p]hotophobia[] and premature [c]ataracts[" a] as a result of [the plaintiff's s]arcidosis. The specialist recommended an [on]going treatment plan and . . . prescribed[ such medications as] [p]rednisone, [t]ravatan [and o]trophine. A surgery was recommended [but not prescribed] to remove the [c]ataracts.
11. Immediately after my arrival I advised the Medical Staff at . . . Fort Dix[] of my eye [condi]tion and the need for contin[uous] treatment . . . .
12. From April 14, 2008[,] until[] August 3, 2008[,] no medical care was provided despite my repeated request[s] . . . .

19

13. On August 3, I initiated my gri[e]vance process demanding to be seen by eye doctor. . . . I then moved to the next level of grievance directly to the Warden . . . .

. . . .

17. . . . [I]n May of 2008, [I] was seen by the [o]ptometrist Dr. Seabur [and] advised [him] of [my] rapid loss of sight and the difficulty in obtaining the appropriate eye drops that was recommended by the . . . specialist [at] Big Spring.

18. During the visit with Dr. Seabur, on May 13, 2008, I requested from Dr. Seabur, that he recommend me to be seen by an outside specialist concerning his inability to cure and care for my eye problems. . . . .

19. At all times I was seen by Dr. Seabur [after this May 2008 visit], he . . . declined to make any referral to an outside specialist.

20. By March of 2009, I have lost complete eye sight and could not read or write.

21. On April 13, 2009[, I was] seen by an outside specialist.

22. Since my arrival at the FCI, Fort Dix, I filed [about 80] grievances [with the bulk of grievances filed at the time when I was given an examination by the outside specialist].

. . . .

48. The denial of proper medication and prescribed eye medication and surgery . . . violated the Eight Amendment . . . .

. . . .

52. From approximately April of 2008 until present while incarcerated at FCI, Fort Dix, plaintiff was subjected to a pattern of systematic and invidious discrimination by defendants due to his color and grievance filing against the defendants.

. . .

63. Plaintiff . . . seeks . . . relief [under the] Federal Tort Claim Act . . . .

Jackson II (Instant Matter), Docket Entry No. 7-1, at 2-14.

## 2.  Facially Invalid Challenges

As the Court's discussed in Jackson I, Plaintiff's challenges based solely on a theory of respondeat superior cannot amount to a viable Bivens claim.  Similarly, since Plaintiff

20

unambiguously asserts that Plaintiff was under the care of Dr. Seabur beginning thirty days after the date of Plaintiff's arrival at Fort Dix, Plaintiff's allegations against the supervising officials based solely on Plaintiff's filing of grievances does not amount to a cognizable claim.  Therefore, for the purposes of the Eighth Amendment, Fourteenth Amendment and First Amendment, Plaintiff's claims against all Defendants other than Dr. Seabur are facially without merit and will be dismissed.

Moreover, Plaintiff's attempts to bootstrap his challenges to the Equal Protection guarantees of the Fifth and Fourteenth Amendments fair no better.[3]  The Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV.  This is not a command that all persons be treated alike, but, rather, a direction that all persons similarly situated be treated alike. See City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985). "The Equal Protection Clause commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws.'"  Vacco v. Quill, 521 U.S. 793, 799 (1997).  "The central purpose of the Equal Protection Clause of the Fourteenth

---

[3]  While the Fifth Amendment contains no equal protection clause, it does forbid discrimination that is so unjustifiable as to be violative of due process. See United States Dep't of Agriculture v. Moreno, 413 U.S. 528 (1973); see also Hampton v Mow Sun Wong, 426 U.S. 88 (1976) (the Due Process Clause of the Fifth Amendment authorizes traditional equal protection analysis).

Amendment is the prevention of official conduct discriminating on the basis of race," Washington v. Davis, 426 U.S. 229, 239 (1976), or any other suspect classification.  See, e.g., Bakke v. California Bd. of Regents, 438 U.S. 265, 291 (1978) ("the guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color" and "racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination").

Here, Plaintiff's equal protection allegations are limited solely to his self-serving conclusion that he was discriminated against on the basis of race.  Plaintiff does not allege a single fact indicating that inmates of other races suffering analogous eye conditions were given different medical care than African-American inmates.  In sum, since Plaintiff's factual allegations are based not on facts allowing for a plausible claim of a violation of equal protection other than Plaintiff's self-serving conclusion, these allegations will be dismissed.  See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) ("A claim has facial plausibility [only] when the plaintiff pleads factual content . . . . [Moreover,] the plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully. [Indeed, even w]here a complaint pleads facts that are merely consistent with a defendant's liability, [the so-alleging

22

complaint still] stops short of [showing] plausibility of entitlement to relief. [A _fortiori_,] the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions [or to t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements [_i.e._, by] legal conclusion[s] couched as a factual allegation") (citations, original brackets and quotation marks omitted).

Finally, Plaintiff's vaguely articulated retaliation claim is also facially without merit. In order to state a retaliation claim under the First Amendment, Plaintiff must assert facts showing that: (i) he engaged in a protected activity; (ii) Defendants' retaliatory actions were sufficient to deter a person of ordinary firmness from exercising his/her rights, and (iii) there was a causal connection between the protected activity and the retaliatory action. _See Jean W. v. Deflaminis_, 480 F.3d 259, 267 (3d Cir. 2007). Here, Plaintiff asserts that he filed numerous administrative grievances seeking examination by an outside specialist and was retaliated against in response to those grievances by not being allowed to see such a specialist. However, Plaintiff simultaneously asserts that the bulk of his grievances were filed at the time when the warden and prison officials had reached the decision to have Plaintiff examined by an outside specialist. Therefore, it is self-evident that there

23

cannot be a causal connection between Plaintiff's alleged protected activity and the alleged retaliatory action because the bulk of the alleged protected activity took place not at the time of the alleged retaliatory act but at the time when Plaintiff was granted the requested medical care.  Consequently, Plaintiff's retaliation claims will similarly be dismissed, under the holding of Iqbal, as implausible.

That leaves the Court with two claims limited in scope that pass the plausibility pleading standard.

### 3.    Plausible Challenges

Plaintiff's claims against Dr. Seabur asserting that Dr. Seabur denied (or excessively delayed) Plaintiff's requests for prescriptions or the dispensing of the already-prescribed medications and eye surgery appear plausible, within the meaning of Iqbal, under the holding of Lanzaro, 834 F.2d at 346, providing that deliberate indifference is demonstrated "[w]hen ... prison authorities prevent an inmate from receiving recommended treatment for serious medical needs."  Id.

### 4.    FTCA Challenges

Analogously, and out of an abundance of caution, this Court finds it warranted to proceed past the sua sponte dismissal stage

and obtain responsive pleadings with regard to Plaintiff's FTCA challenges.[4]

IT IS, therefore, on this __**3rd**__ day of **January** , **2011**,

ORDERED that Plaintiff's motion, Docket Entry No. 7, is granted in part and denied in part; and it is further

ORDERED that Plaintiff's application to proceed in this matter in forma pauperis is granted; and it is further

ORDERED that Plaintiff is assessed a filing fee of $350.00 which shall be deducted from his prison account pursuant to 28 U.S.C. § 1915(b)(2) in the manner set forth below, regardless of the outcome of the litigation; and it is further

ORDERED that, pursuant to 28 U.S.C. § 1915(b)(1)(A), Plaintiff is assessed an initial partial filing fee equal to 20% of the average monthly deposits to Plaintiff's prison account for the six month period immediately preceding the filing of the complaint; when funds exist, the agency having custody of Plaintiff shall deduct said initial fee from Plaintiff's prison account and forward it to the Clerk; and it is further

ORDERED that, pursuant to 28 U.S.C. § 1915(b)(2), until the $350.00 filing fee is paid, each subsequent month that the amount

---

[4] The Court will direct service on the warden of Fort Dix for the purposes of this line of claims; however, such service shall not be construed as this Court's finding that the warden might be liable for Plaintiff's FTCA claims, same as the Court's decision to proceed these claims past the sua sponte dismissal stage shall not be construed as this Court's finding that these claims are procedurally proper of substantively meritorious.

25

in Plaintiff's prison account exceeds $10.00, the agency having custody of Plaintiff shall assess, deduct from the Plaintiff's account, and forward to the Clerk payments equal to 20% of the preceding month's income credited to Plaintiff's prison account, with each payment referencing the docket number of this action; and it is further

ORDERED that, pursuant to 28 U.S.C. § 1915(b), the Clerk shall forward a copy of this Memorandum Opinion & Order by regular mail to the United States Attorney for the District of New Jersey and the agency having custody of Plaintiff; and it is further

ORDERED that the Clerk of the Court shall file Plaintiff's amended complaint, Docket Entry No. 7-1; and it is further

ORDERED that all Plaintiff's claims, except for his Eighth Amendment claims (based on denial of prescribed eye medication and prescribed eye surgery) and his Federal Tort Claim Act challenges, are dismissed with prejudice; and it is further

ORDERED Plaintiff's claims Eighth Amendment claims (based on denial of prescribed eye medication and prescribed eye surgery) and his Federal Tort Claim Act challenges may proceed past the sua sponte dismissal stage; and it is further

ORDERED that the Clerk shall terminate all Defendants, other than Defendants Dr. Seabur and the warden of the Federal

Correctional Facility at Fort Dix, New Jersey, as Defendants in this matter; and it is further

ORDERED that the Clerk shall issue summons, and the United States Marshal shall serve a copy of the amended complaint (Docket Entry No. 7-1), summons, and this Memorandum Opinion & Order upon the aforesaid remaining Defendants, pursuant to 28 U.S.C. § 1915(d); and it is further

ORDERED that the remaining Defendants shall file and serve a responsive pleading within the time specified in Federal Rule of Civil Procedure 12, pursuant to 42 U.S.C. § 1997e(g)(2); and it is further

ORDERED that, pursuant to 28 U.S.C. § 1915(e)(1) and § 4(a) of Appendix H of the Local Civil Rules, the Clerk shall notify Plaintiff of the opportunity to apply in writing to the assigned judge for the appointment of pro bono counsel in accordance with the factors set forth in Tabron v. Grace, 6 F.3d 147 (3d Cir. 1993), cert. denied, 510 U.S. 1196 (1994), which sets forth the requirements for eligibility for appointment of pro bono counsel. Plaintiff is expressly advised that such appointment is neither guaranteed nor automatic; and it is further

ORDERED that the Clerk shall enclose with such notice a copy of Appendix H and a form Application for Appointment of Pro Bono Counsel; and it is further

ORDERED that, if at any time Plaintiff seeks the appointment of pro bono counsel, pursuant to Fed. R. Civ. P. 5(a) and (d), Plaintiff shall (1) serve a copy of the Application for Appointment of Pro Bono Counsel by regular mail upon each party at his last known address, or, if the party is represented in this action by an attorney, upon the party's attorney at the attorney's address, and (2) file a Certificate of Service with the Application for Pro Bono Counsel; and it is finally

ORDERED that the Clerk of the Court shall serve a copy of this Memorandum Opinion & Order on Plaintiff by regular U.S. mail.


/s/ NOEL L. HILLMAN
**Noel L. Hillman, U.S.D.J.**

At Camden, New Jersey

28